# IN THE COURT OF APPEALS OF IOWA

No. 25-1006
Filed October 1, 2025

IN THE INTEREST OF A.S.,
Minor Child,

S.S., Father,
    Appellant.
_____

Appeal from the Iowa District Court for Marshall County, Paul G. Crawford, Judge.

A father appeals the termination of his parental rights to his son. **AFFIRMED.**

Merrill C. Swartz of Swartz Law Firm, Marshalltown, for appellant father.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Mary Cowdrey, State Public Defender's Office, Marshalltown, attorney and guardian ad litem for minor child.

Considered without oral argument by Schumacher, P.J., and Badding and Langholz, JJ.

**LANGHOLZ, Judge.**

A ten-year-old son was removed from his father's custody after the father was arrested for assaulting his then-girlfriend in the son's presence.[1] The father was convicted of domestic-abuse assault and child endangerment—based in part on the son's testimony at trial—and the criminal court entered a no-contact order naming the son as a protected party. The no-contact order was later amended to allow contact at the discretion of the Iowa Department of Health and Human Services ("HHS"), which exercised that discretion to permit written contact at first. But after the son's traumatic reaction to the first letter from the father and lack of desire to respond, the contact did not progress further by the termination hearing.

The juvenile court terminated the father's parental rights.[2] And the father appeals, arguing that termination is not in the best interest of the child and that the court should have granted six more months for reunification. But on our de novo review, we agree with the juvenile court. Given the father's repeated struggles with domestic abuse, the fractured nature of the current father-son relationship, and the son's growing success with his current foster family, termination of the father's parental rights is in the son's best interest and the court appropriately denied the father's request for more time. We thus affirm the termination order.

---

[1] We avoid using the parties' names to respect their privacy because this opinion— unlike the juvenile court's order—is public. *Compare* Iowa Code § 232.147(2) (2025), *with id.* §§ 602.4301(2), 602.5110; *see also* Iowa Ct. R. 21.25.

[2] The juvenile court also terminated the mother's parental rights. But her appeal was dismissed for failure to comply with appellate rules. So we focus on the father.

## I.      Background Facts and Proceedings

In July 2023, the father was arrested for assault of his then-girlfriend upon finding her in bed with another man.  His son—ten years old at the time—witnessed the assault and called 911.  The father was arrested and charged with domestic-abuse assault and child endangerment.  Because the father was in jail, the girlfriend initially cared for the son.  But a few months later, she informed HHS that she could no longer do so, and the son was placed with a relative.  Soon after, the State filed a child in need of assistance ("CINA") petition.  The son was adjudicated in need of assistance, and HHS was granted custody for continued placement with the relative.

The son was placed with a different family after another three months because of behavioral and health concerns during the relative placement.  He had previously been placed with this same family for over a year—when he was seven and eight—during a previous removal from his father's custody in a different CINA case also stemming from the father's domestic violence against the girlfriend.  In fact, the family requested to have the son placed with them after becoming aware that he was in the system again.  The son has remained with this family since February 2024 and is doing well.[3]  He feels safe and comfortable with the family.  The HHS worker testified that the son has a good relationship with them, that "he responds in a very positive manner to their interventions," and that he made it clear that he wants to remain with them.  And the son's attorney and guardian ad litem

---

[3] When the son was initially returned to the family, their foster-care license had lapsed so the placement was as an "other suitable placement."  Iowa Code § 232.102(1)(a)(3).  By the time of the termination hearing, the family had a foster-care license again and the nature of the placement had been adjusted accordingly.

reported that when she asked him about his future, he said, "I don't ever want to leave here. I want to live here forever. I want to be adopted by [the foster family]."

Following the father's arrest, the criminal court issued a temporary no-contact order naming the son as a protected party. Then in April 2024, the father was convicted of domestic abuse assault and child endangerment. The son testified against him at the criminal trial. At sentencing, the court extended the no-contact order for five years. Despite the no-contact order, the father asked the HHS worker to pass on messages to the son at least five times. Each time, she refused because of the order.

After an October 2024 permanency hearing, the juvenile court changed the permanency goal to termination of parental rights. The court reasoned that this goal was in the best interest of the son "[g]iven the length of time that [he] has been out of parental custody and the currently grim forecast for reunification." The State petitioned to terminate the father's parental rights and a hearing was set for early February 2025.

In January, about three weeks before the hearing, the father successfully moved for the criminal court to amend the no-contact order to permit "visitation and contact with [the son] at the discretion of" HHS. HHS decided it was best to start with written contact because of "the lengths of time that they had not had contact" and "to go at [the son's] pace to see how things went for him." And the father wrote a letter to his son. When the son read the letter, "he shut down"—he was so upset "for 20 minutes he would not respond or do much of anything" except sit with his foster mom. At the time of the termination hearing, the son had not yet chosen to

write back despite follow-up from the HHS worker and the foster family. And the son was not yet ready to have any in-person contact with the father.

While the son has been thriving in his current placement, the father has made little progress. He failed to take responsibility for the assault up until the termination hearing. When the HHS worker met with him at the jail in September 2023—a few months after his arrest—he claimed that the girlfriend got aggressive with him and that his hands "ended up on her throat." This continued to be the story he told throughout the proceedings. Then at a January 2025 family team meeting—about three weeks before the termination hearing—after the guardian ad litem spoke about the trauma the son has endured, the father became agitated and responded by referring to the ex-girlfriend as an "animal" and claiming that his involvement with HHS and the problems between him and his son were "all her fault," and that he "did not do anything."

The father changed his tune at the termination hearing, taking responsibility for the assault and saying, "I am very, very remorseful about what happened at that time and I am very sorry about it, and I ask for forgiveness." He claimed the statements at the family team meeting were "bad translation[s]" by the Spanish-language interpreter. He also discussed two virtual therapy programs he has been participating in to help manage his anger—one required by probation and the other attended voluntary. He testified about his success at a new job and a bigger house he planned to get to live in with his son. And he discussed his current relationship with a woman who also testified on his behalf at the hearing.

But ultimately, the juvenile court terminated his parental rights under Iowa Code section 232.116(1)(f) (2025) finding that the son could not be safely returned

to his father's custody and that termination was in the son's best interest. The court also found that none of the permissive exceptions applied and denied the father's request for six additional months to work toward reunification. The court reasoned that if it granted the additional time, "we would likely be in the same situation we are now" in another six months.

The father now appeals, arguing that termination of his parental rights is not in the best interest of his son and that the court should have instead given him six more months for reunification.[4]

## II.     The Son's Best Interest

We review the juvenile court's ruling de novo, giving due weight to the court's factual findings, "particularly regarding credibility determinations." *In re W.T.*, 967 N.W.2d 315, 322 (Iowa 2021). But we are not bound by them. *See id.* "We generally apply a three-step analysis to review termination of parental rights." *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). But here the father only contests the second step—whether termination is in the son's best interest. So we focus our analysis there.

In arguing that termination of his parental rights is not in the son's best interest, the father points to attending therapy to improve his communication and

---

[4] The father's petition on appeal includes a separate section seemingly trying to raise a third claim of error. But we cannot discern what that issue is. The section heading and some of the argument appear to relate to a different case. It cites the statute and a case dealing with the permissive statutory exceptions but includes no fleshed out argument that any particular statutory exception should apply. And the only case-specific argument appears to be focused on the best-interest analysis, so we consider it for that purpose. Because we cannot "craft an argument on [the father's] behalf," any other claim of error is waived. *In re L.F.*, No. 24-1141, 2024 WL 4620507, at *2 (Iowa Ct. App. Oct. 30, 2024).

manage anger, planning to buy a new house, and maintaining a healthy relationship with a new girlfriend. He argues that this progress shows that there is "no need" to terminate his parental rights. Yet the best interest analysis turns on what is best for *the son* now and in the future. It focuses on the son's safety, long-term development, and overall well-being. *See* Iowa Code § 232.116(2). And "we gain insight into the child's prospects by reviewing evidence of the parent's past performance—for it may be indicative of the parent's future capabilities." *In re W.M.*, 957 N.W.2d 305, 315 (Iowa 2021) (cleaned up). While the father took some positive steps to better himself in the months before the termination hearing, this cannot eliminate his history of abuse. *See In re C.B.*, 611 N.W.2d 489, 494 (Iowa 2000) (reasoning that while the parent "took positive steps to turn her life around in the months prior to the termination hearing, these steps do not eliminate her past").

This is the second time the son has been removed from his father's custody. Both times were for more than a year. And both were because of the father's domestic abuse. *In re W.M.*, 957 N.W.2d at 315. (finding the parent "has shown a pattern of behavior in the past that indicates how she will act in the future"). We cannot overlook this pattern of assault and the father's disregard for caring for his son. And the most recent assault that started this case required the son to call 911 on his own father. The son shared with the HHS worker that he was scared to call the police because he was afraid of what his father would think or do to him. The son even testified against him at the criminal trial. No child should be put in that position.

What's more, the father repeatedly denied responsibility for the assault leading to the removal, criminal conviction, and no-contact order. Instead, he blamed his ex-girlfriend, calling her an "animal." Such behavior is problematic because "[i]t is vital in a juvenile matter [that] the parent[] recognize abuse occurred." *In re T.J.O.,* 527 N.W.2d 417, 421 (Iowa Ct. App. 1994). "[A]nd the requirement that the parents acknowledge and recognize the abuse before any meaningful change can occur is essential in meeting the child's needs." *In re H.R.K.,* 433 N.W.2d 46, 50 (Iowa Ct. App. 1988). The juvenile court was "unconvinced of the father's improvement," and we agree.

And because of the father's criminal conduct, he and the son have had no contact except for a single letter from the father to the son since his July 2023 assault. And even that limited contact was traumatic for the son, who has no desire to write back or attempt an in-person visit. The no-contact order is expected to remain in effect into 2029 with visitation and contact only at the discretion of HHS and no reasonable likelihood that the son could return to the father's custody any time soon.

Meanwhile, the son is doing well with his foster family. *See* Iowa Code § 232.116(2)(b). "If the children have been placed in foster care, we consider the extent to which they have become integrated into that family." *In re M.W.,* 876 N.W.2d 212, 224 (Iowa 2016). "For integration, we look at how long the children have been living with the foster family, how continuity would affect the children, and the preference of the children if they are capable of expressing a preference." *Id.* The son has lived with this foster family in both this case and the earlier removal, and by now will have lived with them for about three years in total.

The son is safe in this placement. The HHS worker testified that the son has a good relationship with the family and is comfortable with them. The son—now twelve-years-old—has expressed that he wants to be adopted by this family and live with them forever. So the son is clearly integrated into this foster family and his preference is to stay with them.

Our best-interest analysis is also "impacted heavily by the need for permanency: we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *In re R.M.-V.*, 13 N.W.3d 620, 626 (Iowa Ct. App. 2024) (cleaned up). Considering the son's safety, overall well-being, need for permanency, successful integration with the foster family, and the father's unwillingness to accept responsibility for his actions that created the need for removal and inability to demonstrate meaningful change, termination is in the best interest of the son.

### III.     Additional Time for Reunification.

The father also argues that the juvenile court should have given him six more months to work toward reunification rather than terminating his rights.[5] *See* Iowa Code §§ 232.117(5), 232.104(2)(b). A juvenile court may do so "only if the need for removal 'will no longer exist at the end of the additional six-month period.'" *In re W.T.*, 967 N.W.2d at 323 (quoting Iowa Code § 232.104(2)(b)). Again, this is the second case requiring the son's removal. The father did not make meaningful

---

[5] Under this single claim of error, the father briefly contends that HHS did not make reasonable efforts at reunification. But he did not include this as one of his separately enumerated issues on appeal, so we do not consider it properly presented. *See In re L.A.*, 20 N.W.3d 529, 534 n.2 (Iowa Ct. App. 2025) (en banc).

change after the first incident and in his most recent outburst—where he blamed the girlfriend—he showed that he has not taken responsibility for the abuse or made the necessary changes to show that in six months removal will no longer be necessary. We thus agree with the juvenile court's finding that if we granted the additional six months, "we would likely be in the same position we are now." And so, we affirm the juvenile court's denial of the father's request for more time and the termination of his parental rights.

**AFFIRMED.**